In re PIERCE, BUTLER & PIERCE MFG. CO.

(District Court, N. D. New York. March 20, 1916.)

1. NEWSPAPERS ⬅️5(2)—PUBLICATION—COMPENSATION—LEGAL NOTICE.

Where a trustee in bankruptcy as an officer of the court sends to a newspaper a legal notice of sale of property which the court has ordered published, there is a necessary implication that such notice should be published as a legal notice, and the publisher is not, in the absence of any direction, entitled to infer that the notice should be published as a display advertisement, and to collect compensation on that basis.

[Ed. Note.—For other cases, see Newspapers, Cent. Dig. §§ 23, 24; Dec. Dig. ⬅️5(2).]

2. NEWSPAPERS ⬅️5(2)—PUBLICATION OF NOTICE—"EXPRESS CONTRACT"—"IMPLIED CONTRACT."

"Express contracts" are where the terms of the agreement are openly avowed and uttered, while "implied contracts" are such as are presumed by the law from the nature of the transaction; therefore, where a trustee in bankruptcy, under order of court, sent for publication to a newspaper a legal notice of a sale of property, there is an implied contract that the notice would be published at the customary rates for publication of such notices, and the newspaper company, which was directed in case

of doubt to consult the trustee, cannot, having published the notice as a display advertisement instead of as a legal notice, recover extra compensation.

[Ed. Note.—For other cases, see Newspapers, Cent. Dig. §§ 23, 24; Dec. Dig. ⊕⇒5(2).

For other definitions, see Words and Phrases, First and Second Series, Express Contract; Implied Contract.]

In Bankruptcy. In the matter of the bankruptcy of the Pierce, Butler & Pierce Manufacturing Company. Application by trustee to have fixed the amount he should pay the Tribune Company of Chicago, Ill., for printing notice of sale and notice of adjournment. On exceptions to the report of the special master. Report disapproved, and compensation in a less amount allowed.

This is an application to the court by the trustee in bankruptcy to have fixed the amount he shall pay the Tribune Company of the city of Chicago, Ill., for printing a notice of sale and notice of adjournment thereof in the Chicago Tribune printed and published in that city. The matter comes up on the report of a special master to whom it was referred by the court for examination, testimony, and report of the facts, together with his conclusions thereon. The special master reports certain facts, and then that: "In my opinion, an order should be made by the court, directing the payment of the bill as rendered for $1,384.56 and the expense of the hearings before the special master." The trustee in bankruptcy attacks this report, and asks the court to disregard and set aside this conclusion and fix the amount that should be paid at a just and fair compensation.

Wilson, Cobb & Ryan, of Syracuse, N. Y., for claimant.

N. P. Bonney, of Norwich, N. Y., and Wm. A. MacKenzie, of Syracuse, N. Y., for trustee.

RAY, District Judge (after stating the facts as above). In the course of the administration of the bankrupt estate of Pierce, Butler & Pierce Manufacturing Company, it became necessary to sell and dispose of the assets of the bankrupt company, consisting of parcels of real estate in various localities, with a manufacturing plant at Syracuse, N. Y., and raw material, merchandise, machinery, patterns, tools, and equipment going with the plant. The bankrupt company had acquired large property interests in the city of Chicago, or that vicinity, and in authorizing the public sale of the assets of the bankrupt, real and personal, the court in its discretion deemed it necessary and proper to direct that the notice of sale be published in more than one newspaper, and therefore directed that it be published in the Post Standard at Syracuse, N. Y., where the main business plant and offices of the bankrupt were situated, and also once each week for three weeks in a newspaper regularly issued and having a general circulation in the cities of Chicago and New York.

The notice of sale, which was an ordinary legal notice of sale, headed:

"United States District Court, Northern District of New York. In the Matter of Pierce, Butler & Pierce Manufacturing Company, Bankrupt. In Bankruptcy No. 5460. Notice of Sale"

—recited in the very beginning that notice was given pursuant to an order of the court, duly entered in the above-entitled proceeding on

the 29th day of June, and, after giving the time and place of sale contained a description of the property to be sold, and was dated June 30, 1914, and signed "James P. Hill, Trustee." This was a legal advertisement pure and simple, and so showed on its face. This notice was forwarded on the 30th day of June, 1914, to the Chicago Tribune, Chicago, Ill., for publication therein accompanied by the following letter:

"James P. Hill, Trustee,

"Pierce, Butler & Pierce Mfg. Co., Bankrupt,

"821 Onondaga County Savings Bank Bldg.

"Syracuse, N. Y., June 30, 1914.

"The Chicago Tribune, Chicago, Ill.—Gentlemen: I hand you herewith notice of sale of the property and assets of the Pierce, Butler & Pierce Manufacturing Company, bankrupt. This must be published once a week for· three successive weeks, beginning Thursday July 2d. Do not fail to get it into the Thursday issue of this week. Forward the bill at once to James P. Hill, trustee, 821 O. C. S. B. Bldg., Syracuse, New York, and we will remit promptly.

"If any question comes up about the notice call me on the phone at the office of William A. MacKenzie, O. C. S. B. Bldg., Syracuse, New York, Phone, Warren 619, and if I am not there ask for Mr. MacKenzie, or if you do not get him call me at 109J, Norwich, New York.

"To repeat the·directions publish this notice in your daily paper once in each week during three successive weeks beginning Thursday July 2d and continuing Thursday July 9th, closing July 16th.

"Please acknowledge receipt by telegraphing at my expense.

"Very truly yours,          N. P. Bonney, Attorney for Trustee."

This communication from Mr. Bonney as attorney for the trustee, as will be seen, contained no request or suggestion that the notice be published as other than an ordinary notice of sale of property made pursuant to an order of the court. There was no suggestion or request that it be put in any particular place in the paper, or published as a display or financial advertisement. The implied request was that it be published in the Chicago Tribune as and for just what it was on its face, a legal notice of sale of property. The notice was received by Mr. McFarland, the manager of the classified advertisements, but he, instead of causing it to be published as a classified advertisement, where the rates for publication would have been 20 cents per line, as established by the Tribune Company, turned it over to a Mr. Lowery, manager of the financial department of advertising, and it appears from the evidence that the established rates of the Tribune Company for publishing "display" advertisements was 40 cents· per line in the daily paper reduced to 36 cents per line if the notice exceeded 2,500· lines. Mr. Lowery caused it to be published on the page in the paper preceding the classified advertisements, and on the page arbitrarily termed "display advertisements." One or both of these gentlemen states that while there were no directions or intimation that it was· desired to give this notice other than ·ordinary position in the paper, they decided that, as it came from outside the state of Illinois, the trustee and his attorney, one or both, wanted a buyer for the property, and so decided to publish it on the so-called display advertisement page, where the rate, not counting deduction, would be just dou-

ble what it would have been had it been published on the classified advertising pages.

Later in the judgment of the court, adjournment of the sale being wise and necessary, six or seven short notices of postponement were published in the same paper, but the publication of the main notice was not continued under these adjournment notices. Prior to publishing the notice of sale and the notices of adjournment, the claimant, the Tribune Company, did not communicate with the trustee in any manner or with his attorney, although requested so to do "if any question comes up about the notice," and two persons, with their addresses, were named with whom communication could be had. After the publication was completed the Chicago Tribune rendered a bill for publishing the main notice July 2d, July 9th, and July 16th, at $480 for each publication, making $1,440, and for the notices of adjournment charging $20 for each of three publications, $14 for another and $5.40 for the publication of each of two of the adjournment notices, the two being published under "L. N. Class," and $12.40 for another, making a total bill of $1,537.20. A credit was given as follows:

"By credit to reduce rate of display advertising to 2,500 lines basis, 3,816 lines at difference of 4 cents per line, $152.64"

—leaving the net balance claimed $1,384.56. This bill the trustee refused to pay, on the ground that the charges were unreasonable, and that the notice and notices of adjournment should have been published in the paper as a legal notice, and at the rates fixed by the paper for publishing legal notices, and that the claimant had no right or authority to publish the advertisement as "display," if it published it at all, at least without first consulting or communicating with the persons named in the letter of June 30, 1914, above quoted. On the page where the original notice was published there is no statement, and nothing to show that it was published as a display advertisement and there is no evidence that there was any statement in the paper anywhere indicating or calling attention to the fact that such a notice was being published out of the usual order of legal notices. On the same page with one of the publications of the notice itself is a heading in the first column, "Wheat Stronger, Offerings Light," and in the heading of the next two columns we find "Board of Trade Transactions," and in the fourth, fifth, sixth and seventh columns, occupying the balance of that page, we find the notice in question. The heading of the notice:

"United States District Court, Northern District of New York. In the Matter of Pierce, Butler & Pierce Manufacturing Company, Bankrupt. In Bankruptcy No. 5460"

—is in larger type than ordinary, but the notice itself is printed in very small type.

The trustee has been willing to pay, and has offered to pay $500 for the publication of the notices, but this the Tribune Company refused to accept and filed a petition, setting out certain facts and praying:

"That an order be made herein, directing the said trustee to pay your petitioner the amount due it for said services so performed, with interest thereon

as aforesaid, and that your petitioner be allowed the costs and disbursements of this proceeding out of said bankrupt estate."

The matter was then referred as aforesaid for the purposes aforesaid.

The letters of July 23d, August 4th, August 12th, August 25th, September 1st, and September 10th, requesting publication of the adjournment notices, were accompanied by the notice to be published, each of which notices stated that it was in pursuance of an order duly entered in the matter, and stated, in substance:

"I hand you herewith copy of notice of adjournment of the sale in the Matter of Pierce, Butler & Pierce Manufacturing Company, Bankrupt. Please publish the same once this week and once next week and mail proof of publication and bill to James P. Hill, 821 O. C. S. B. Bldg., Syracuse, N. Y."

In each of these requests there was nothing said about the particular place in the paper in which same should be published, and there was no request that same be treated otherwise than as the ordinary legal notice of sale. On the notice of adjournment of August 5th was indorsed by the claimant a memorandum that it should be published on the financial page. This was true of the adjournment notice of August 12th, but on the adjournment notice of August 25th was indorsed by the claimant, "Legal," and on the adjournment notice of September 11th, was indorsed by the claimant, "Legal Notice."

Lowery, manager of the financial and industrial advertising departments of the Chicago Tribune, was asked, on direct:

"What directions, if any, as to what particular class of advertisement this was to appear in? A. I gave the order clerk instructions to run it in the financial and commercial section. Q. Why? A. Because that was the usual place for advertisements of that character. Q. Now tell us why it would run there instead of what you might call 'classified'? A. Well, advertisements of that character may be run either display or classified. If it is in the classified, it would have taken, at the time that advertising was sent in, the regular classified rate, which was 20 cents a line, daily, and 35 cents a line Sunday. Q. And in the display it came to— A. In the display it would take the rate of 30 cents a line, or of 40 cents a line daily, and 50 cents a line Sundays. * * * Q. Why did you direct that to go as display rather than as classified? A. The administrative rule of the Tribune provides that in all legal notices wherever the notice—and this is the custom which we follow— whenever the notice is published because of some legal requirement, and there is not the maximum amount of publicity required or desired, it shall go into the classified, but wherever the advertisement is placed for the publicity value of it, we put it in the financial and commercial section. * * * Q. You may proceed now? A. In this case it was apparent to me that the advertisement was not being placed in Illinois to comply with any legal requirement. Secondly, it was apparent that this advertisement was being placed for the purpose of selling real estate situated in other states, stocks, bonds, choses in action, equipment of the plant, and so on, and the ordinary and usual place, and the only place in the Chicago Tribune for such advertising is in the financial and commercial section."

The witness McFarland for the claimant, testified that he is the advertising manager, and has held the position five years, and was asked what they put in the classified advertisements, and answered all the character of the advertisements that come under the heading of classified index. He stated that he saw the letter inclosing the advertisement of this sale in question here, and was asked:

"Q. Would that [referring to classified index] include an advertisement such as was included in this letter from Mr. Hill's attorneys?"

His answer was, "Yes, sir." He said that he received the letter first, and then turned it over to Mr. Lowery, and heard nothing more of it. He then attempted to justify putting this notice of sale into the display column at double rates for the reason:

"A. Because it appeared from the copy that they wanted a buyer for this sale."

Nothing of this kind appears in the evidence from anything stated or written by the trustee in bankruptcy, and nothing of the kind appears in the notice itself, except as it is inferred from the fact that it was a notice of sale. McFarland further testified:

"Q. What class of advertisements go into the financial display as a rule? A. Merchandise advertisements, advertisements that required what we call attention getting power; that is, what is known as display advertisements."

There was no request from the trustee or his attorney that this notice of sale be published as a merchandise advertisement, which it was not, or that it was to be published so as to have "attention getting power." The witness further says that if a lawsuit was pending in Illinois, where under the law, in order to have a valid decree, there had to be an advertisement placed in a newspaper in Chicago, that advertisement would go in the classified columns of the paper. The witness also testified that this legal notice in one of the papers appeared on page 21, and that if it had appeared as a classified advertisement, it would have been on page 22 or one of the following pages.

There is evidence that for display advertising in this paper the charge of 36 cents per line is reasonable for Chicago. The question is, Was this claimant, the Chicago Tribune, justified in publishing this legal advertisement of this sale in the display columns on so-called display pages, instead of in the classified advertisements and on the classified pages where legal advertisements required by law to be published are published in the absence of special contract or special request?

[1] When this trustee in bankruptcy, an officer of this court, sent this notice of sale of property in a legal proceeding pending in and directed by this court, and which notice was ordered by the court to be published in the Chicago Tribune, the trustee expected, and had the lawful right to expect, as did the court itself, engaged as it was in administering the estate of the bankrupt, that the Chicago Tribune, if it undertook to publish the notice as requested, would publish it on the days mentioned and once in each week for three successive weeks, and that it would publish it as a legal notice of sale of bankrupt property required to be published by law, for it showed on its face that it was a legal notice to be published according to law, and one required to be published by law, as it recited that the sale had been ordered by the court in a pending bankruptcy proceeding. It was the duty of the Chicago Tribune, and necessarily implied if that company undertook the publication, that it would publish the notice if reasonably possible in that part of the paper devoted to the publication of notices of that

kind and description, to wit, legal notices of sale in legal proceedings and charge therefor the legal rates fixed by law, if any, for publishing legal notices, or, if there were none, then the rates for such a publication fixed by the custom and usage, or rules and regulations of the Chicago Tribune regulating rates, if any, and in this case 20 cents per line was the charge or rate so fixed. If any question arose as to this publication and its proper location in the paper, the trustee was to be notified. This was a specific instruction, and the Chicago Tribune was under no obligation to accept the work if unable or not willing to comply with this condition imposed by the trustee. In accepting the proposition or offer of the work to be done by it, the Chicago Tribune was not called upon to assume on conjecture, or justified in assuming on conjecturing, that the trustee in bankruptcy or the court had any purpose or desire other than that such notice should be published in that paper in due course on the days referred to, and in spaces or columns of that paper devoted to the publication of that class and kind of work, viz., legal notices in a pending proceeding in the bankruptcy court, and in accepting the work, in the absence of any special or specific agreement relating thereto, the Chicago Tribune impliedly undertook and agreed to charge therefor and accept its usual and customary price for publishing that class and kind of notices, and which in this case was 20 cents per line. That price and no other there was an implied promise to pay. It was, of course, implied and well understood that notice of the sale of the property was desired and intended to be given to all who might desire to purchase so far as possible, as otherwise the notice and its publication in Chicago would not have been directed by the court or trustee, but it was perfectly plain on the face of the papers to any intelligent mind that no special or extra or "display" notice was intended or desired, either generally or to any special or specific class of readers of the Chicago Tribune, by giving the notice a preferential or "display" position, as nothing to that effect was contained in either the letter of Mr. Bonney, the attorney for the trustee, or in the notice itself even by implication. But more than this, it is obvious, on inspection of the paper itself, that no unusual or special notice of this sale was in fact given to its readers by reason of the location, place, or page this notice occupied in the paper. No special attention was called to it in any way. In fact readers looking for bankrupt sales or other "legal sales" would look in the columns devoted to such notices.

If when an ordinary legal notice of sale of bankrupt property is sent to the publisher of a newspaper for publication he may assume, or in his own mind conclude and determine on his own surmises and understanding, without consulting or notifying either the court or trustee, that more than ordinary notice is desired and intended, and thereupon place such notice in some conspicuous or "display" place in the paper for which double the usual rates for the publication of such a notice is charged, a wide field for extensive newspaper charges and profits will be opened, and bankrupt estates and dividends therein correspondingly decreased.

[2] This court does not regard it necessary that a trustee in bank-

ruptcy shall affirmatively instruct newspaper publishers, to whom a legal notice of a proceeding in bankruptcy is sent for publication, that such notice must not be published in so-called "display" columns or on so-called "display" pages. The instruction is implied to publish it in the columns and on the pages devoted to the publication of legal notices. If a special contract is to be made or a special and extraordinary obligation or liability imposed, it is necessary that the minds of the parties meet, or that something be done and brought to the attention of the party to be charged, accompanied by such conduct or want of action on his part that assent may be inferred and found, or that such party be estopped thereafter to deny the implied contract arising from either conduct or silence. The advertising managers of the Chicago Tribune, acting alone, could not make a special contract with or impose an extraordinary liability on this trustee in bankruptcy, or the estate represented by him, by publishing this notice as "display," in the absence of something in the order for the work authorizing it or conferring discretion in the premises. The witness Lowery states that:

"Whenever the notice is published because of some legal requirement, and there is not the maximum amount of publicity required or desired, it shall go into the classified [20 cents per line], but whenever the advertisement is placed for the publicity value of it, we put it in the financial and commercial section. * * * In this case it was apparent to me that the advertisement was not being placed in Illinois to comply with any legal requirement. Secondly, it was apparent that this advertisement was being placed for the purpose of selling," etc.

This notice was published because of a legal requirement, the order of the court, and Lowery had no authority to determine otherwise, and it was not for Lowery, in the absence of the trustee, either to assume or try and determine the question how much or what degree of publicity was desired by such trustee. Presumably the trustee wanted such publicity as a notice of sale in a legal proceeding would give readers of legal notices of sale, not display advertisements, and presumably the notice was published to aid in securing a sale. I think all courts assume that the publication of notices of sale in legal proceedings are required by statute and by courts for the purpose of giving notice and to aid in securing a sale of the property. This is the "legal requirement" to be "satisfied" in all cases, and requires no action or determination on the part of a newspaper manager to determine it. If the trustee desired extra notice or "display advertising" at an added expense of some $700 due solely to location of the advertisement in the paper, it was for him, not the Tribune Company, to say. If a question arose in the mind of Lowery, that is, "If any question comes up about the notice," says the letter, it was incumbent on the Tribune to call up Bonney or MacKenzie as directed. An extra or added expense of $700 in publishing an ordinary notice of sale of bankrupt property is not a small matter, and creditors who are represented by the trustee have the right to have the estate economically administered.

"Express contracts are where the terms of the agreement are openly avowed and uttered at the time of the making of it. Implied contracts are such as reason and justice dictate from the nature of the transaction, and which, therefore, the law presumes that every man undertakes to perform." Morley

v. Lake Shore, etc., R. Co., 146 U. S. 162, 173, 174, 13 Sup. Ct. 54, 58, 36 L. Ed. 925; 4 Encyclopedia of U. S. Sup. Ct. Reports, 568.

Reason and justice in this case, from the very nature of the transaction and the fact that legal notices had a customary place in this paper at 20 cents per line, dictate that the Tribune should have accepted the publication at that rate, and that the trustee and this court had the right to assume that it would and did, if it published the notice at all. That was the customary and reasonable charge for publishing or printing such a notice on the classified pages, and in the classified columns where the notice belonged.

There is not a scintilla of evidence in the case that it cost the claimant here more to publish this notice on the pages where it was published than on the pages where it should have been published. This contract was partly written and partly implied, but no agreement can be implied that the notice might at the option of the Tribune Company, without notice to the trustee, be published as a "display advertisement" at double the rates charged for legal notices required by law to be published. There is no evidence the trustee knew of or had his attention called to any "display" columns, and it is certain there was no order or authority from this court or the trustee to give the notice extra or special location or display. No such contract was made, and no such contract can be implied. See generally 9 Cyc. 252, 270, 582, and cases cited. This court finds and holds on the entire evidence that 20 cents per line for the publication of these notices of sale was the fair, just, and reasonable value of the work done and service performed. There were 3,870 lines, and at 20 cents per line the amount of compensation should be $774. No tender was made, and for this reason interest on that sum will be allowed from November 1, 1914, or $64.50, in all $838.50.

The report of the special master is disapproved and not adopted or confirmed.

There will be an order allowing and directing the payment of the claim by the trustee at the sum stated, $838.50, from the assets of the estate.